715 So.2d 423 (1998)
Willie BROWN
v.
SOUTHERN BAPTIST HOSPITAL, et al.
AMERICAN MOTORISTS INSURANCE COMPANY
v.
Lisa SULZER, et al.
Nos. 96-CA-1990, 96-CA-1991.
Court of Appeal of Louisiana, Fourth Circuit.
March 11, 1998.
Opinion Clarifying Judgment on Grant of Rehearing April 15, 1998.
*426 Gerald J. Leydecker, New Orleans, and Christopher B. Siegrist, Houma, for Plaintiff/Appellant.
Edward J. Lassus, Jr., Law Office of Cerio A. Dimarco, Slidell, for Plaintiff/Appellant American Motorists Insurance Company.
Gregory C. Weiss, Stephen R. Barry, Weiss & Eason, L.L.P., New Orleans, for Defendants/Appellees Lisa Sulzer and Northeast Louisiana University.
Fred T. Hinrichs, Christovich & Kearney, L.L.P., New Orleans, for Defendant/Appellee Chicago Insurance Company.
Joseph W. Looney, Adams and Reese, New Orleans, for Defendant/Appellant Mercy/Baptist Medical Center.
C.T. Williams, Jr., J. Elliott Baker, Blue Williams, L.L.P., Metairie, for Intervenor/Appellant Louisiana Patient's Compensation Fund and Oversight Board.
Before BARRY, KLEES and LANDRIEU, JJ.
LANDRIEU, Judge.
As a result of an injury Willie Brown received while working at the Broadmoor Animal Hospital (Broadmoor), he was admitted to Southern Baptist Hospital[1] (SBH) in June of 1989 for treatment, including surgery, of a severely-infected finger. On June 30, 1989, Lisa Sulzer, a student extern from Northeast Louisiana University (NLU), working under the direct supervision of Frances Ramos, an SBH pharmacist, allegedly prepared a defective Bunnell's irrigation solution,[2] which was administered to Brown's surgical wound. The solution was dripped into the gauze of Brown's dressing from approximately 12:30 p.m. on June 30 until 10:00 a.m. the following day. Throughout the evening, Brown complained to the attending nurse of a burning sensation in his hand, but his complaints went unheeded. When his bandages were removed on July 1, it was discovered that Brown had suffered second and third degree burns to his right ring finger and extensive chemical burns to his hand, wrist, and forearm. As a result of the burns Brown underwent six additional surgeries which included the amputation of his ring finger and several skin grafts.
Brown sued Sulzer, the Board of Trustees of NLU, its insurer, the Chicago Insurance Company (Chicago), and SBH. Subsequently, the American Motorist Insurance Company (American), the worker's compensation carrier for Broadmoor, and the Louisiana Patient's Compensation Fund and Oversight Board (LPCF) intervened in the suit. SBH filed a cross-claim against Chicago for coverage of the pharmacist under Sulzer's insurance policy and moved for summary judgment, which was denied. After a jury trial, judgment was rendered in favor of Brown and against SBH in the amount of $1,009,344.00, subject to the statutory cap of the Malpractice Liability for State Services Act (MLSSA), and in favor of American and against SBH for $58,292.83 in medical benefits and $24,127.90 in worker's compensation *427 wage benefits previously paid to Brown. All claims against Sulzer, NLU, and Chicago were dismissed with prejudice. SBH, LPCF, American, and Brown have filed appeals.
SBH asserts:
(1) The trial court failed to give a jury charge on NLU's duty to supervise its students;
(2) The trial court erred in entering judgment in favor of Chicago on SBH's cross-claim for insurance coverage; and
(3) There was insufficient evidence to support the jury's finding of negligence and breach of the standard of care by its nurses.
LPCF asserts the trial court erred in:
(1) Failing to find Sulzer's negligence the legal cause of Brown's injuries;
(2) Failing to cast Chicago in judgment;
(3) Finding Sulzer a qualified health care provider under MLSSA;
(4) Awarding $84,000.00 for Brown's past lost wages and $260,344.00 for future lost wages and his loss of earning capacity;
(5) Awarding duplicate damages;
(6) Awarding excessive general damages;
(7) Awarding $23,000.00 for future medical expenses;
(8) Awarding legal interest under La.Rev. Stat. 40:1299.42(B)(3);
(9) Finding the attendant nurses negligent and their negligence the cause of Brown's injuries;
(10) Finding pharmacist Frances Ramos negligent and her negligence the cause of Brown's injuries;
(11) Ruling that Chamberlain v. State, Through Dep't of Transp. and Dev. rendered La.Rev.Stat. 40:1299.39 invalid;
(12) Finding SBH to be a qualified health care provider while not finding its attending nurses and pharmacists to be qualified health care providers; and
(13) Failing to hold Sulzer to a professional standard of care.
American asserts the trial court erred in:
(1)-(3) Dismissing its claim against NLU, Sulzer, and Chicago;
(4)-(5) Not finding NLU guilty of malpractice or negligence;
(6) Not finding NLU strictly liable;
(7) Not finding NLU vicariously liable for Sulzer's negligence;
(8) Not finding NLU vicariously liable for Ramos's actions;
(9) Holding that NLU is covered under MLSSA and that the statutory cap applies;
(10) Finding Sulzer's negligence was not the legal cause of Brown's injuries;
(11) Finding that Sulzer is covered under MLSSA and that the statutory cap applies;
(12) Holding that the statutory cap under MLSSA is constitutional;
(13) & (15) Not finding NLU vicariously liable for the actions of its professor, Dr. Eugene Watkins;
(14) Determining that SBH and Ramos were instructors and supervisors of NLU's course Pharmacy 495;
(16) & (17) Failing to hold NLU vicariously liable for the actions of SBH and/or its staff under the terms of their contract;
(18) Failing to find NLU negligent for its failure to instruct Sulzer properly;
(19) Failing to hold Sulzer to a professional standard of care;
(20) Failing to find Chicago liable if Sulzer is found liable;
(21) Failing to find Chicago liable in solido for Ramos's negligence; and
(22) Failing to cast Chicago for the negligence of Watkins under the Direct Action Statute.
Sulzer asserts:
(1) If the trial court erred in not finding her negligent, then the judgment dismissing NLU and Chicago was an error;

*428 (2) If the trial court erred in finding that she was covered by MLSSA, but the statutory cap does not apply, then the judgment should be amended accordingly; and
(3) If the trial court erred in holding the statutory cap is constitutional, then the judgment should be amended accordingly.

DISCUSSION

SBH'S ASSIGNMENTS OF ERROR

Omission of Jury Charge
SBH argues the trial court erred when it did not correctly instruct the jury on the pharmacist's duty to supervise, which would result in the case being reviewed de novo. SBH asserted at trial that its pharmacist was an adjunct faculty member of NLU and that her duty to supervise Sulzer was equivalent to NLU's duty to supervise its students. In this vein, SBH requested the court instruct the jury that "a teaching institution and its personnel are not obligated to maintain constant surveillance of students without some notice or indication of possible trouble." Instead, the judge instructed the jury that the duty to supervise varies with the facts and circumstances of the individual cases:
Under Louisiana law a teacher is not liable in damages unless it is shown that he or she by exercising a degree of supervision required by the circumstances might have prevented the act which caused the damage and did not do so.
* * * * * *
So the degree of supervision as to a proctor or a teacher depends on the particular circumstances involved and the risks, type of duty being performed, the type of work being exercised and all of those things may be considered by you in determining whether or not there was negligence or malpractice in the failure of supervision.
Article 1792, Section B of the Louisiana Code of Civil Procedure provides that "[a]fter the trial of the case and the presentation of all the evidence and arguments, the court shall instruct the jurors in the law applicable to the cause submitted to them." The trial court has a duty to give accurate and necessary jury instructions based on the particular facts and evidence of the case. Jones v. Peyton Place, Inc., 95-0574, p. 6 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 760.
The cases cited by SBH as support for its requested jury charge do not comport factually with the instant case and do not support the proposed instruction. The cases cited all involved elementary or secondary school students who were injured while on school grounds. Those courts refused to place an impossible duty upon a teacher to monitor every student at all times. Although SBH argues the trial court should have instructed the jury that the supervising pharmacist had no legal duty to monitor Sulzer constantly while she prepared the irrigation solution, Ramos was not a playground supervisor. She was supervising a pharmacy student intern who was preparing compounds and solutions to be administered to patients in the hospital. Therefore, Ramos's duty to supervise and monitor her charge was greater than the duty of an ordinary school teacher.
In Butler v. Louisiana State Bd. of Ed., 331 So.2d 192 (La.App. 3 Cir.), writ refused, 334 So.2d 230 (La.1976), the duty owed by a professor to a volunteer student donating blood was equivalent to the duty owed by a physician to his patient in the same circumstances. There, a university biology professor approved and undertook to supervise a student project which required the withdrawal of blood samples from student volunteers. The blood withdrawals were performed by the student in the professor's office. The plaintiff, who had become syncopic after donating five cubic centimeters of blood, fainted while she was walking towards a conference table where she was going to lie down. Because she was not being assisted with the proper support, the plaintiff fell forward and broke several of her teeth. The student who had withdrawn the blood later admitted that a blood donor having a syncopic episode requires physical assistance and should not be permitted to walk unaided. The Third Circuit found that the professor owed a duty to the volunteer patient or blood donor to see *429 that the same precautions were taken to preserve the safety and well-being of that patient as would be taken by a licensed medical doctor, even though the student withdrawing the blood had more experience and training performing the procedure than the professor.
The Butler court, therefore, placed a greater duty upon a non-medical professor who had undertaken to supervise a medical procedure than would be placed upon a school teacher supervising her students on the playground or in the classroom. Likewise, Ramos's duty to supervise Sulzer as she was preparing a solution to be administered to a hospital patient, who had little or no ability to protect himself from harm, was greater than the duty of supervision owed by a school teacher to her students.
The Third Circuit in Prier v. Horace Mann Ins. Co., 351 So.2d 265 (La.App. 3 Cir.), writ denied, 352 So.2d 1042 (La.1977), one of the cases cited by SBH, acknowledged that the degree of supervision required of a teacher or instructor depended on the circumstances involved. There, the court stated:
School teachers charged with the duty of superintending children in the school must exercise reasonable supervision over them, commensurate with the age of the children and the attendant circumstances. A greater degree of care must be exercised if the student is required to use or come in contact with an inherently dangerous object, or to engage in an activity where it is reasonably foreseeable that an accident or injury may occur. The teacher is not liable in damages unless it is shown that he or she, by exercising the degree of supervision required by the circumstances, might have prevented the act which caused the damage, and did not do so. It is also essential to recovery that there be proof of negligence in failing to provide the required supervision and proof of a causal connection between that lack of supervision and the accident.
Prier, 351 So.2d at 268 (citations omitted).
SBH has not directed us to a more persuasive case to support its proposed instruction; therefore, we find no error in the charge given to the jury.

Chicago's Coverage of SBH's Pharmacist
SBH asserts judgment should not have been rendered in favor of Chicago on SBH's cross-claim for insurance coverage. Specifically, SBH argues the policy purchased by Sulzer through Chicago should extend to cover the actions of SBH's pharmacist Frances Ramos, because, as a preceptor, she was an adjunct professor of NLU. The trial court, which dismissed SBH's claim with prejudice following trial, implicitly found that Frances Ramos, SBH's pharmacist, was not covered under the language of the contract.
Factual determinations of the trial court are subject to review under the manifest error rule. Stobart v. State, Through Dep't of Transp. and Dev., 617 So.2d 880 (La.1993).
We find no manifest error in the trial court's ruling. The policy issued by Chicago defined those covered as follows:
PERSONS INSURED: Each of the following is an insured under this insurance, to the extent set forth below:
A. Students of the program specified in the application on file with and approved by the Company, but only while said students are participating in activities that are a part of and a requirement of the student's curriculum at the school or university specified in Item 1 NAMED INSURED of the DECLARATIONS, and
B. Faculty Members of the school or university specified in Item 1 NAMED INSURED of the DECLARATIONS, but solely as respects claims arising out of the supervision/instruction of the student insured under the provisions of the policy.
The agreement between SBH and NLU provides that "[t]he Preceptor shall have a nonsalaried adjunct clinical instructor appointment to the extramural faculty of the University." SBH argues Ramos is covered under the policy because she is a "preceptor" and an adjunct member of NLU's faculty. A preceptor, under Louisiana Pharmacy Law, is "a Louisiana licensed pharmacist who has been recognized as a certified preceptor *430 qualified to proctor in the extern/intern practical experience program."[3] The evidence at trial showed that James deJean of SBH was the only "preceptor" qualified and certified by the state; Ramos was not.
SBH further argues Ramos was covered under the policy because she had supervised Sulzer. The Chicago policy does not define "faculty member." At trial, however, Dr. C. Eugene Watkins, the head of the extern program for NLU, testified that he was the "faculty member" who supervised Sulzer's practicum in her pharmaceutical course. When asked if Ramos was also a faculty member, he responded that he did not know her.
Ramos testified that she was not, nor had she ever been, a faculty member of NLU. She further explained that she has never drawn a salary nor received any direct benefits from NLU.
We find no error in the trial court's determination that Ramos's occasional supervision of Sulzer did not make Ramos a "faculty member" within the language of the insurance policy.

Negligence of SBH Nurses
SBH contends there was insufficient evidence to support the jury's finding of negligence and breach of the standard of care by its nurses. Sufficiency of the evidence is reviewed under the manifest error standard. Ambrose v. New Orleans Police Dep't Ambulance Service, 93-3099 (La.App. 4 Cir. 7/5/94), 639 So.2d 216.
SBH asserts its nurses had no way of knowing that the Bunnell's solution was defective, because Brown's complaints were consistent with post-operative pain. Brown, however, testified that he repeatedly told the nurse on duty that his hand burned and felt hot. He stated that he asked the nurse to check his hand, but she did not. Pamela Taylor Harris, the nurse who was on duty the evening of June 30, testified that she could not remember if she examined Brown's hand but that she was surprised when he reported a burning pain in his arm. In general, the nurses on duty that night testified that they had responded as necessary to Brown's complaints.
Bonnie Meeker, an expert in the field of nursing, testified that a Bunnell's solution should be soothing and not cause a burning sensation. Such a reaction would be an unusual post-operative response, according to Meeker, and the fact that Brown experienced no relief after numerous shots of Demerol and Percocet should have alerted the attending personnel that something was wrong.[4] To Meeker, failure either to check the dressing or to call the doctor under the above circumstances was a violation of the standard of nursing care.
The trier of fact determines the credibility of the witnesses; evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989). We find no error in the jury's finding that the nurses were negligent and that their behavior was below the acceptable nursing standard of care.

LPCF'S ASSIGNMENTS OF ERROR

Negligence of Sulzer as Legal Cause
LPCF asserts the jurors erred by finding Sulzer negligent in her preparation of the Bunnell's solution, while also finding that her negligence was not the legal cause of Brown's injuries. Sulzer responds that the jury's determination could have been based upon a finding that she had not prepared the solution.
Whether the actor's conduct was the cause in fact of the plaintiff's injuries is determined by the trier of fact. Hultzer v. Cole, 93-0486 (La.App. 1 Cir. 3/11/94), 633 So.2d 1319, writ denied, 94-0850 (La.5/13/94), 637 So.2d 1070. Accordingly, such a determination is reviewed under the manifest error rule. Stobart, supra, 617 So.2d at 882-83.
*431 The jury presumably found that Sulzer had prepared the defective solution. La.Rev. Stat. 37:1195 B states:
B. All receptacles containing compounded or filled prescriptions shall bear a label showing the prescription number, the name of the person actually and personally filling, compounding or dispensing the prescription, the directions for its use internally or externally, as specified by the prescriber, the date of its compounding or filling, and the name of the store or the proprietor thereof. (Emphasis added).
Sulzer testified that while an extern at SBH she remembered mixing two Bunnell's solutions, one of which was done under the supervision of pharmacist Ramos. She stated that she was not sure which solution was used on Brown but that she routinely initialed any bottle she prepared. "FAR" were the only initials on the bottle which had contained the defective solution; Ramos identified them as hers. If the jury had determined that Ramos actually and personally compounded the solution, its finding that Sulzer was negligent would have been unfounded. The jury's determination, therefore, was presumably based on a belief that Sulzer had prepared the defective solution.
The judge instructed the jury as follows:
But when talking about negligence or malpractice remember mere negligence or malpractice is not sufficient to base liability upon. It must be based upon causation.
Now, causation alone does not pose liability upon a defendant. Plaintiff in this case Mr. Brown must further prove that the causation was a substantial cause or a contributing cause to the injuries that he sustained.
It is not inconsistent that the jury found Sulzer negligent while also concluding that her negligence was not a substantial factor in causing Brown's injuries. The jury's finding that Sulzer was negligent could have been based on her incorrect preparation of the solution. Sulzer admitted that she did not follow the sequential steps of the formula for the solution.[5] She added the glacial acetic acid to the bottle of sterile water before she poured the glycerine into the bottle. Kerry McGarrity, an expert in pharmacology, stated that the glycerine should be added to the water first to prevent too much glacial acetic acid being added to the mixture.
Ramos was supervising Sulzer to prevent such mistakes from occurring. Yet, by her own admission, there were moments when Ramos did not or could not see the bottles from which Sulzer drew fluids because she was on the telephone. The jury, therefore, could have reasonably concluded that Ramos's negligent supervision was a substantial cause of the injury and that Sulzer's negligence was not. We find the jury was not manifestly erroneous in its finding.

Chicago's Liability
Because we affirm the findings that Sulzer's negligence was not the legal cause of Brown's injuries and that Chicago's policy did not extend to Ramos, we find no error in the trial court's refusal to cast Chicago in judgment.

Sulzer as a Qualified Health Care Provider
Whether Sulzer was correctly determined to be a qualified health care provider under Louisiana statutes is irrelevant, because she is not liable for Brown's injuries.

Awards for Past and Future Lost Wages and Loss of Earning Capacity
LPCF asserts the jury erroneously awarded Brown past lost wages and past loss of earning capacity in the amount of $84,000.00.
To recover past and future lost wages and lost earning capacity, the plaintiff must prove these items of damages with reasonable certainty. Whatley v. Regional Transit Authority, 563 So.2d 1194, 1203 (La. App. 4 Cir.), writ denied, 569 So.2d 965 (La.1990). Such calculations, however, need not be made with mathematical certainty. Id. Loss of past and future income is not merely predicated upon the difference between a plaintiff's actual earnings before and after a disabling injury, but upon the difference between a plaintiff's earning capacity *432 before and after the injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979); Buffinet v. Plaquemines Parish Com'n, 93-0840, pp. 20-21 (La.App. 4 Cir. 7/27/94), 645 So.2d 631, 644, writs denied, 95-0100, 95-0105, 95-0109 (La.3/17/95), 651 So.2d 269, 270; Finnie v. Vallee, 620 So.2d 897 (La.App. 4 Cir.), writ denied, 625 So.2d 1040 (La.1993). Some of the factors to consider when making an award for lost wages and loss of earning capacity include: plaintiff's physical condition before the accident, plaintiff's work record before and after the accident, amounts earned in previous years, inflation, and the probability that, except for the injury, the plaintiff would have earned similar wages the rest of his life. See Masters v. City of New Orleans, 94-2349 (La.App. 4 Cir. 9/28/95), 662 So.2d 125; Finnie v. Vallee, 620 So.2d at 901. The jury's findings as to lost earnings may not be disturbed on appeal absent a finding that they were without foundation or were clearly wrong. Buffinet, 93-0840, p. 21, 645 So.2d at 644.
Thomas Meunier, a vocational rehabilitation counselor, testified that Brown had a pre-injury capacity to earn $8.00 to $9.00 per hour doing physical labor. He also stated that Brown now has medical limitations which preclude heavy physical labor and which allow him to work only at sedentary jobs or those requiring light or moderate physical labor, so long as Brown does not expose his hand to blunt trauma. Some examples include light janitorial work or cashiering. Meunier predicted that Brown could earn, post-injury, about $5.00 to $6.00 per hour. He stated that Brown's loss of earning capacity was roughly about twenty to twenty-five percent. Meunier testified that Brown could not return to his duties as a veterinarian assistant.
Melville Wolfson, an economist, testified regarding two methods of computing past lost wages, including past lost earning capacity. One method was to determine Brown's pre-injury earning potential from the date of the accident (July 1989) until the date of trial (November 1995), and then to subtract actual wages earned. Wolfson used a figure of $19,000.00 in annual income to calculate a potential income of $121,000.00 over the relevant time period.[6] After calculating Brown's actual wages as $17,130.00, Wolfson estimated Brown's lost wages as $103,870.00.
Wolfson gave somewhat confusing testimony as to a second method of calculating past lost wages. This approach involved multiplying Brown's pre-injury earning potential, $121,000.00, by the percentage of lost earning potential, which he stated as thirty percent, and then subtracting this amount, $36,300.00, from the pre-injury earning potential, leaving an amount of $84,700.00.[7] Brown's counsel referred to this sum as $84,000.00. On cross-examination, Wolfson clarified that the amount of $84,700.00 was based on an estimate that Brown lost seventy percent of his pre-injury earning capacity. He calculated that the loss of earning capacity would have been $24,200.00 using a figure of twenty percent.
Because the jury's award of $84,000.00 for past lost wages and earning capacity falls below the estimate of $103,870.00 but above the amount of $24,200.00 estimated on cross-examination, we cannot say that the jury erred in awarding this amount for past lost wages and past lost earning capacity.
LPCF next asserts the jury erred in awarding Brown $260,344.00 for his future lost wages and loss of earning capacity. We agree.
At the time of the accident, Brown was earning $4.90 an hour as a veterinarian assistant; at the time of trial, he was earning *433 approximately $6.00 an hour as a light duty janitor in a coffee warehouse.[8] However, Meunier testified that Brown had the pre-injury capacity to earn $8.00 to $9.00 per hour.
Based on a work-life of 15.1 years and an average annual income of $19,000.00, Wolfson reckoned that Brown would require, using a six percent rate of inflation, $242,751.00 to compensate him for his loss if he were completely disabled.[9] If he were able to work for minimum wage, his loss would be $129,807.00. If he were able to earn $6.00 per hour, his loss would drop to $83,301.00.[10]
The record clearly does not support the jury's award of $260,344.00. The testimony established that Brown is capable of light janitorial work and that he had been successfully performing such work at or above minimum wage since the accident, though sometimes on a temporary basis. No evidence indicated that Brown would be unable to perform such work on a permanent basis. Based on the record, we find the jury abused its discretion in awarding this amount. Accordingly, we reduce Brown's special damage award for lost future wages and lost earning capacity to $129,807.00.

Duplicate Damages
LPCF contends the trial court erred in awarding $125,000.00 for "disfigurement, scarring, and loss of enjoyment of life," because it is duplicative of the awards of $250,000.00 for "past suffering, pain, and mental anguish" and $175,000.00 for "future suffering, pain, and mental anguish."
Brown counters that LPCF lacks standing to raise this issue, because it is an intervenor, rather than a party to the suit, and did not object to the jury interrogatories in a timely manner.
Brown's argument is without merit. This issue was squarely addressed in Smith v. Juneau, 95-0724 (La.App. 4 Cir. 4/9/97), 692 So.2d 1365, in which LPCF asserted that the award for permanent disability, scarring, and disfigurement was duplicative of more general awards of past and future pain and suffering. This Court held that LPCF had standing to raise the assignment of error on appeal, because it was precluded from intervening prior to a judgment of greater than $100,000.00, a judgment which brought LPCF into the litigation after trial was complete. Likewise, LPCF has standing to assert its claim of duplicative awards in the instant case.
LPCF asserts Brown was doubly compensated for loss of enjoyment of life and for scarring and disfigurement by his damage awards for past and future pain and suffering.
LPCF's argument has merit. In Smith v. Juneau, this Court opined that separate damages for loss of enjoyment of life are duplicative of an award for past and future mental anguish if, after examining the entire record, the reviewing court determines that no distinction was made between the enjoyment of life and mental anguish. 95-0724, pp. 38-39, 692 So.2d at 1383-84. More recently, this Court held that a separate award for hedonic damages, i.e., damages for loss of enjoyment of life, is erroneous as a matter of law. Mistich v. Volkswagen of Germany, 94-0226 (La.App. 4 Cir. 6/25/97), 698 So.2d 47. The Court reasoned that such damages are included in the concept of general damages, because, like damages for pain and suffering, they "cannot be quantified with any degree of `pecuniary exactitude' or measured definitely in terms of money." Id., p. 5, 698 So.2d at 51 (quoting Foster v. Trafalgar House Oil & Gas, 603 So.2d 284, 285 (La.App. 2 Cir.1992)). Under Mistich, then, the award for loss of enjoyment of life in the instant case is duplicative of the award for past and future pain and suffering. Moreover, *434 neither the testimony, nor the closing arguments, nor the jury instructions clearly differentiated the damages for loss of enjoyment of life and those for pain and suffering. Compare Smith v. Juneau, supra.
The award for disfigurement and scarring is also duplicative of the award for pain and suffering. Disfigurement and scarring have as an integral part of their substance the mental pain and anguish that accompany such disfigurement and scarring. Smith v. Juneau, 95-0724, p. 41, 692 So.2d at 1385 (citing Day v. South Line Equip. Co., 551 So.2d 774 (La.App. 1 Cir.), writ denied, 553 So.2d 474 (La.1989)).
For these reasons, the $125,000.00 award for loss of enjoyment of life and for scarring and disfigurement must be deleted from the judgment.

Excessive General Damages
LPCF further asserts the damages for past and future pain and suffering are excessive. Thus, we must determine whether an award of $425,000.00 in general damages is an abuse of discretion.
In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the jury or judge. La.Code Civ. Proc. art. 2324.1. An appellate court should not disturb an award unless it is an abuse of discretion. Guillen v. Transit Management of Southeast Louisiana, 94-0947 (La.App. 4 Cir. 12/28/94), 648 So.2d 487. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the great discretion of the trier of fact. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Ruiz v. Oniate, 96-2211, 96-2214, 96-2212, 96-2213 (La.App. 4 Cir. 8/6/97), 697 So.2d 1373. General damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors which affect the victim's life. Delphen v. Dep't of Transp. and Dev., 94-1261, pp. 13-14 (La.App. 4 Cir. 5/24/95), 657 So.2d 328, 336, writs denied, 95-2116, 95-2124 (La.11/17/95), 663 So.2d 716.
In the present case, Brown endured pain for ten hours while the acid burned his skin; he suffered the shock of seeing his hand badly burned and his right ring finger amputated. He underwent several skin grafts as a result of the burns. Though he went through weeks of physical therapy, he still does not have full use of his hand: his strength is limited and he cannot grasp items securely. He has sustained a total body disability of 8%, a 15% disability to his right hand, 100% disability of the amputated finger, 80% disability of the right long finger, and 20% disability of the right little finger. Brown became very depressed over the physical appearance of his hand and wore a glove to conceal his burns for several years. He was treated for his depression for several years through drug therapy as well as psychiatric and psychological therapy. There is no question that this accident has had a negative impact on Brown's life.
On the other hand, the record establishes that this negative impact has ameliorated substantially. Although Brown's sister stated that he was so depressed he stopped seeing his friends, Brown voluntarily left the care of his psychiatrist, who had been effectively treating him for depression, and began seeing a psychologist recommended by his attorney. Brown testified that he no longer sees the psychologist as frequently as before, because he had been feeling better. His psychologist, agreeing that Brown has made progress, stated that he is not as emotionally changeable, or labile, as he had been in the past.
The psychologist testified that Brown was most depressed because he could no longer support his wife and unborn child and had eventually lost his family because of his injuries. The record, however, establishes that Brown was never married and that the mother of his child had brought criminal charges against him as a result of a domestic dispute before the accident occurred. The record also shows that Brown now dates and has a more normal social life than he did immediately after the accident.
*435 There was testimony presented that Brown has been forced to live with his sister and sleep on the floor because he cannot work. However, the vocational rehabilitation counselor testified that Brown is capable of light physical labor and sedentary jobs and that he has successfully held jobs since the accident. Brown does not experience continual pain but feels a shocking sensation if the tip of his amputation is touched. Brown's psychologist stated that being able to work is very important to Brown's emotional well-being; yet, he does not pursue jobs even though he has achieved success in some areas since his accident.
Accordingly, considering the particular injuries suffered by Brown, we find an award of $425,000.00 clearly abusive of the jury's much discretion.
Once it has been determined that an award is abusive, the next step is to review prior awards for the purpose of determining the lowest and highest points reasonable for the award. Reck v. Stevens, 373 So.2d 498 (La.1979); Ruiz v. Oniate, pp. 23-24, 697 So.2d at 1385.
In Head v. Pendleton Methodist Memorial Hosp., 95-0461 (La.App. 4 Cir. 1/31/96), 669 So.2d 504, an award of $400,000.00 was affirmed for a woman who had the tips of two fingers amputated after she was burned by a wet-heat treatment. As a result she suffered physical and severe emotional problems. She lost use of her right hand, could no longer ambulate without the use of her walker, could not manage her own personal hygiene, and had to learn how to eat with her left hand. She was diagnosed with a 78-84% impairment of her right hand.
In LeBlanc v. Continental Grain Company, Inc., 95-813 (La.App. 5 Cir. 3/13/96), 672 So.2d 951, writ denied, 96-1526 (La.10/4/96), 679 So.2d 1383, an award of $209,000.00, though "somewhat on the high side," was affirmed for a man who had two fingers partially amputated in an industrial accident. He suffered with continued swelling and pain; eventually, one of his injured fingers had to be amputated. The plaintiff, a carpenter at the time of the accident but who later became an electrician, suffered a loss of dexterity in his hand and would continue to have a weak grip and a loss of fine coordination. He had a 50% anatomical impairment of one finger and an 85% impairment of the index finger.
In Fontana v. Coca-Cola Enterprises, Inc., 93-1003 (La.App. 4 Cir. 2/11/94), 632 So.2d 811, an award of $200,000.00 was affirmed for a man whose favored hand was crushed in an elevator door. He suffered severe pain and suffering for over four years and underwent two surgeries. He wore a cast for thirty days and underwent physical therapy. He had permanent pain in his hand, had a loss of strength in his grip, and developed ulnar nerve damage. He had a diagnosis of a 10% disability to his arm but none to his hand.
In Barbin on Behalf of Barbin v. State, 506 So.2d 888 (La.App. 1 Cir.1987), an award of $185,000.00 was upheld for a twelve-year-old student who was injured in a woodworking class at the school for the deaf. His right index finger was cut from the tip into the proximal interphalangeal joint. Permanent impairment of the finger was assessed at 58%, with an overall 15% disability to the hand. The student's damaged and disfigured finger impaired his ability to communicate by sign language and hampered his ability to pursue a career in computer science.
In Chatelain v. Project Square 221, 505 So.2d 177 (La.App. 4 Cir.), writ denied, 508 So.2d 71 (La.1987), an award of $102,000.00 was affirmed for a man whose right hand was practically severed at the wrist by a moving elevator. The plaintiff, a sixty-three-year-old carpenter, was diagnosed as disabled and could no longer work.
In Williams v. Stevenson, 558 So.2d 1204 (La.App. 1 Cir.), writ denied, 564 So.2d 324 (La.1990), an award of $5,000.00 was raised to $50,000.00 for a woman who sustained injury to her right hand when she was accidentally shot. She had her index finger amputated, underwent six surgeries, could not grasp anything with her hand, and suffered constant pain. Her hand healed with malalignment resulting in a deformed appearance. She sustained 50% disability to her right hand and had difficulty dressing herself.
*436 In view of these cases, we find that $250,000.00 is the most a jury could have reasonably awarded within its discretion to this plaintiff in these circumstances. Accordingly, we reduce the general damages award from $425,000.00 to $250,000.00.

Future Medical Expenses
LPCF contends the record does not support an award of $23,000.00 for future medical expenses.
To recover future medical expenses, the plaintiff must prove that the expenses are necessary by a preponderance of the evidence. Rice v. ABC Ins. Co., 95-2008 (La.App. 4 Cir. 4/3/96), 672 So.2d 1109, writ denied, 96-1113 (La.6/7/96), 674 So.2d 971. When a need for future care has been established, but the cost is uncertain, a reasonable award may be made. Id., 95-2008, p. 3, 672 So.2d at 1112.
Brown is no longer under treatment for either his finger or hand. There was no testimony that he would require future physical or occupational therapy. Dr. D.D. Delgado stated that he was unaware of any future surgery that Brown might need. There was testimony from the treating psychologist that Brown would benefit from continued therapy to assist him in coping with the changes in his life. She stated that she charges $135.00 per hour and that he should be seen on a weekly basis for three to five years. The psychologist, however, admitted that she has decreased the frequency of his sessions to occasional visits, and Brown stated that he is feeling better about himself and has started dating again. Consequently, we reduce the award for future medicals to $10,000.00, which would more than adequately cover the occasional therapy sessions recommended by Brown's psychologist.

Legal Interest under La.Rev.Stat. 40:1299.42 B(3)
LPCF argues that the judgment rendered is unclear as to who is obligated to pay legal interest on the first $100,000.00 of the judgment. The judgment states:
It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Willie Brown, and against the defendant, Southern Baptist Hospital, in the full and true sum of ONE MILLION NINE THOUSAND THREE HUNDRED FORTY-FOUR ($1,009,344.00) DOLLARS AND NO/100 CENTS, subject to the limitation provided in La. R.S. 40:1299.42B(1), and in La. R.S. 40:1299.42B(2), together with legal interest on $100,000 from April 1, 1991, until paid; further subject to the limitation provided in La. R.S. 40:1299.42B(1), and in La. R.S. 40:1299.42B(3), together with legal interest on $500,000 from date of judicial demand until paid....
Articles 40:1299.42 B(1), B(2), and B(3) of the Louisiana Revised Statutes provide in pertinent part:
(1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits ..., shall not exceed five hundred thousand dollars plus interest and costs.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.[11]
(3)(a) Any amount due from a judgment... which is in excess of the total liability of all liable health care providers, as provided in Paragraph (2) of this Subsection, shall be paid from the patient's compensation fund....
(b) The total amounts paid in accordance with Paragraphs (2) and (3) of this Subsection shall not exceed the limitation as provided in Paragraph (1) of this Subsection.
In Delome v. Tulane Educ. Fund, 96-2051, 96-2052 (La.App. 4 Cir. 11/19/97), 703 So.2d 139, we considered the issue of interest respectively owed by the qualified health care provider and LPCF. There, the health care provider, before trial, settled with the plaintiffs for $100,000.00 including any interest owed. Following trial against LPCF, the jury found in favor of the plaintiffs and awarded them a total of $100,000.00. On *437 appeal, the plaintiffs alleged that LPCF was responsible for all interest on the $100,000.00 from the date of the request for review of the claim by a medical review panel. Relying on La.Rev.Stat. 40:1299.42 B, Seagers v. Pailet, 95-924 (La.App. 5 Cir. 5/15/96), 680 So.2d 46, writ denied, 96-2730 (La.1/6/97), 685 So.2d 117, and Castillo v. Montelepre, Inc., 999 F.2d 931 (5th Cir.1993), but distinguishing Harden v. Southern Baptist Hosp., 94-2228 (La.App. 4 Cir. 10/12/95), 663 So.2d 443, writ denied, 95-2751 (La.1/26/96), 666 So.2d 676, we concluded that LPCF was responsible only for the interest on the $100,000.00 which had accrued from the date of the request for the medical review panel until April 1, 1991. The interest on the $100,000.00 after April 1, 1991, was owed by the health care provider and, in the Delome case, was included in the provider's settlement with the plaintiffs.
Reading the district court's judgment in light of the statute and Delome, we interpret it to mean that the health care provider must pay judicial interest from April 1, 1991, on the first $100,000.00 of the judgment. LPCF must pay judicial interest from the date of filing the complaint with the Patient's Compensation Oversight Board until April 1, 1991, on the first $100,000.00 and must pay judicial interest from the date of the filing the complaint with the Oversight Board on the remaining $400,000.00.[12] There is no error in the district court's judgment.[13]

Negligence of SBH Nurses
As discussed above, the finding of negligence on the part of the SBH nurses is affirmed.

Negligence of SBH Pharmacist
LPCF alleges the jury erred in finding Frances Ramos negligent and her negligence the cause of Brown's injuries. It adopts all arguments put forth by SBH on this issue; however, SBH presented no such arguments in its brief. Rule 2-12.4 of the Uniform Rules of Louisiana Courts of Appeal states that "[a]ll specifications or assignments of error must be briefed. The court may consider as abandoned any specification or assignment of error which has not been briefed."
Nevertheless, we will exercise our prerogative and address the alleged error. Ramos was responsible for supervising Sulzer as she prepared the Bunnell's solution. Ramos testified that during the preparation, she answered the telephone on the other side of the room from Sulzer but was still able to see her actions. The defective bottle had Ramos's initials on it. The jury reasonably found that Ramos was negligent in her supervision and that her negligence was a substantial factor in causing Brown's injury. We find no merit in this assignment of error.

Cap on Amount of State Liability
LPCF argues the trial court erred in holding, prior to trial, that the statutory cap on liability provided for in La.Rev.Stat. 1299.39 would not be applicable to the State under the decision of Chamberlain v. State, Through Dep't of Transp. and Dev., 624 So.2d 874 (La.1993). Because we have affirmed the trial court's finding that Sulzer's negligence was not the cause of Brown's injury, this assignment of error need not be addressed.

SBH Nurses and Pharmacist as Qualified Health Care Providers
LPCF argues that, if SBH was found to be a qualified health care provider, then its negligent employees should also be identified as such. To reduce its liability, LPCF seeks additional credits of $100,000.00 per provider/employee.
*438 This Court resolved the issue in Otnott v. Morgan, 93-0684 (La.App. 4 Cir. 3/15/94), 636 So.2d 957, writ denied, 94-1743 (La.10/28/94), 644 So.2d 650, when it stated:
The statutory scheme for the Patient's Compensation Fund cannot be construed to permit the Fund to be credited not only with the $100,000 paid by the health care provider, but also with another $100,000 paid by an employee of the health care provider whose negligence alone caused the health care provider to be liable in the first instance.
Otnott, 636 So.2d at 960 (emphasis added).
In its reasons for judgment, the trial court stated that the finding of negligence on the part of Ramos and the attending nurses justified the verdict against SBH. LPCF argues that, because Otnott used the word "alone," and the instant jury found two employees liable, Otnott is inapplicable to the case at hand. We disagree. Under Otnott, even if Brown's injuries were caused by the negligence of two or more employees of a particular qualified health care provider, LPCF is entitled to one credit only. Accordingly, we find no merit in this assignment of error.

Sulzer's Standard of Care
LPCF adopts the arguments set forth in American's original brief. American asserts Sulzer should have been held to the same standard as a professional pharmacist, because, as a student, she was permitted to perform pharmacist functions under the direct supervision of a Louisiana licensed pharmacist preceptor. They cite Butler v. Louisiana State Bd. of Ed., supra, for the proposition that "nurses and medical technicians who undertake to perform medical services are subject to the same rules relating to the duty of care and to liability as are physicians in the performance of professional services." American argues that, because a student is supervised by a professional, the student becomes a medical technician under the law and is held to professional standards.[14]
This assignment of error is ultimately without merit. The jury found Sulzer negligent but concluded that her negligence was not the legal cause of Brown's injuries.

AMERICAN'S ASSIGNMENTS OF ERROR
American's assignments of error Nos. 1, 2, 3, 8, 10, 11, 12, 14, 16, 17, and 19 have already been addressed in this opinion; they will not be discussed further. Assignments of error Nos. 4, 5, 6, 7, 9, 13, 20, and 21 are moot and will not be addressed. The only remaining assignments, Nos. 13, 15, 18, and 22, concern NLU's vicarious liability for the actions of Dr. Eugene Watkins and for its allegedly negligent instruction of Sulzer.
American argues that NLU is liable for Brown's injuries because Dr. Eugene Watkins, Sulzer's supervising professor from NLU, was to visit the hospital on regular intervals to monitor the progress of the student under the agreement between NLU and SBH. American asserts that, because Dr. Watkins was at the hospital that morning, presumably monitoring the progress of his students, and did not prevent Sulzer's negligence, he is responsible for Brown's injuries. American also asserts NLU is liable because its curriculum lacked a requisite course on compounding solutions.
Liability in a negligence case requires proof of five elements: (1) duty, (2) breach, (3) cause-in-fact, (4) legal cause, (5) and damages. Fowler v. Roberts, 556 So.2d 1 (La. 1989); La. Civ.Code art. 2315. We affirm the trial court's holding that Sulzer's negligence was not the legal cause of Brown's injuries. Accordingly, we need not consider whether Dr. Watkins's supervision of Sulzer was a substantial factor in causing Brown's *439 injuries or whether Sulzer should have been required to take a particular course.

SULZER'S ASSIGNMENTS OF ERROR
Sulzer's assignments of error also need not be addressed, because we affirm the trial court's judgment that her negligence was not the cause of Brown's injuries.

CONCLUSION
The trial court's judgment that SBH is solely liable for Brown's injuries is affirmed. The award of $84,000.00 for past lost wages is affirmed. The remaining damages are amended as follows: future lost wages and loss of earning potential are reduced from $260,344.00 to $129,807.00; the award for loss of enjoyment of life and for disfigurement and scarring, $125,000.00, is deleted; general damages are reduced from $425,000.00 to $250,000.00; and future medical expenses are reduced from $23,000.00 to $10,000.00. In sum, SBH is solely liable for Brown's injuries in the amount of $463,807.00, plus $10,000.00 for future medical care and $92,000.00 for past medical expenses.[15] This award is subject to the limitations of La.Rev.Stat. 40:1299.42 B. Consequently, SBH is cast for $100,000.00 plus interest from April 1, 1991, until the date paid. LPCF is cast for $463,807.00, plus interest on that amount from the date of the filing of the complaint with the Oversight Board, but with credit for the amount paid by SBH. The awards of $58,292.83 in medical benefits and $24,127.90 for worker's compensation wage benefits to American are affirmed as set forth in the district court's judgment.
Accordingly, the judgment of January 17, 1996, is amended and affirmed as amended.
AFFIRMED AS AMENDED.

APPLICATION FOR REHEARING GRANTED IN PART
The applications for rehearing filed by American Motorists Insurance Company and Mr. Brown are granted in part for the sole purpose of clarifying our judgment of March 11, 1998. Because Southern Baptist Hospital waived the medical review panel, the judgment is clarified to provide that interest shall accrue from the date of judicial demand, rather than the date of the filing of the claim with the Oversight Board, unless otherwise specified. Furthermore, to eliminate any possible confusion, we reiterate that the total award in favor of Mr. Brown is $463,807.00 in damages and lost wages, $10,000.00 for future medical care, and $92,000.00 in past medical expenses, plus any accrued interest on these amounts, subject to the limitations and provisions of La. Rev.Stat. 40:1299.42 B and any other applicable statute.
Otherwise, the applications for rehearing are denied.
NOTES
[1] Sometime after 1989, Southern Baptist Hospital was temporarily called Mercy+Baptist Medical Center and is referred to as such in its brief. It is now the Memorial Medical Center. In this opinion, it will be called by its name at the time of the accident.
[2] The Bunnell's solution formula calls for glacial acetic acid to comprise .49% of the solution. A chemical analysis of the solution given to Brown was 47% glacial acetic acid.
[3] La. Phar. Law, Title 46, Professional and Occupational Standards, Part LIII, Chapter 7, Sec. 709.
[4] Brown received shots of Demerol at 11:30 p.m. and 3:30 a.m. and shots of Percocet at 1:30 a.m. and 6:00 a.m. from Nurse Harris.
[5] The formula stated that 200 milliliters should be poured out of a 500 milliliter bottle of sterile water, 200 milliliters of glycerine is added to the bottle of sterile water, and then 2.5 cubic centimeters of glacial acetic acid is to be added to the sterile water.
[6] Wolfson, referring to a report prepared by Meunier, stated that Brown could have earned between $15,000.00 and $23,000.00 per year and used $19,000.00 as the average. This figure is equivalent to $9.50 per hour, forty hours per week, fifty weeks per year. Meunier, however, testified that Brown could have earned pre-injury up to $9.00 per hour. At trial, Wolfson acknowledged that, pre-injury, Brown's actual annual income was $9,996.00 per year on average.
[7] Based on Brown's actual pre-injury earnings, Wolfson calculated the past lost wages in the amount of $63,658.00 assuming a disability of one hundred percent and a figure of $14,323.00 using a disability of twenty-two and one-half percent (the average of twenty and twenty-five percent loss of earning capacity estimated by Meunier).
[8] According to Meunier, Brown had been working at the coffee warehouse since February of 1995. The trial was conducted in November of 1995.
[9] Wolfson originally gave the jury higher figures, because he used an incorrect birth date for Brown when calculating his loss of future earnings. This opinion incorporates the corrected figures that Wolfson gave during his cross-examination.
[10] Using Brown's averaged, actual pre-injury income of $9,996.00 per year, Wolfson calculated a total disability loss of $127,712.00, a loss of $38,686.00 if Brown earned minimum wage, and a zero loss if Brown continued to work for $6.00 per hour.
[11] The underlined portion was added by Acts 1990, No. 967, § 2, eff. October 1, 1990.
[12] La.Rev.Stat. 40:1299.47 M provides that "[l]egal interest shall accrue from the date of filing of the complaint with the board on a judgment rendered by a court in a suit for medical malpractice brought after compliance with this Part." La.Rev.Stat. 40:1299.47 A(2) sets forth the procedure for filing with the Oversight Board a request for review of a medical malpractice claim by a medical review panel. SBH waived a medical review panel under La.Rev.Stat. 40:1299.47 B(1)(c); the record does not indicate the date the complaint was filed with the Oversight Board.
[13] Interest on medical expenses, past and future, and related benefits are handled differently. See Maxwell v. Soileau, 561 So.2d 1378 (La.App. 5 Cir.), writ denied, 567 So.2d 1123, 1124 (La. 1990); Lamark v. NME Hospitals, Inc., 522 So.2d 634 (La.App. 4 Cir.), writ denied, 526 So.2d 803 (La.1988); see also La.Rev.Stat. 40:1299.43.
[14] The judge instructed the jury as follows:

Now, in considering the alleged negligence of Lisa Sulzer you must consider whether Ms. Sulzer acted as a reasonable woman who was a student extern while she was in the course and scope of her duties as an extern.
You must consider the fact that she was a student and that she was not held out to be an accomplished professional or not held out to be a pharmacist.
She is not held out to the standards of malpractice, she is held to the standards of what a reasonable man or woman should have done under the circumstances considering her education and her status as a student.
[15] The award for past medical expenses was not appealed.