726 So.2d 1028 (1999)
Katherine M. VALLEY
v.
SPECIALTY RESTAURANT CORPORATION d/b/a Algiers Landing Restaurant.
No. 98-CA-0438
Court of Appeal of Louisiana, Fourth Circuit.
January 19, 1999.
*1030 Robert A. Caplan, Ericka Schexnayder Brignac, Lewis & Caplan, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
James R. Sutterfield, Charmagne A. Padua, Sutterfield, Webb & Smith, L.L.C., New Orleans, Louisiana, Counsel for Defendant/Appellant.
Court composed of Chief Judge DENIS A. BARRY, Judge STEVEN R. PLOTKIN, and Judge MOON LANDRIEU.
LANDRIEU, Judge.
This appeal arises out of a lawsuit for damages sustained by the plaintiff, Katherine M. Valley, when she slipped and fell in the Algiers Landing Restaurant on Mother's Day in May of 1988. Following a bench trial in August of 1997, the district court in September of 1997 found in favor of the plaintiff and against the defendants, Specialty Restaurant Corporation, and its insurer, New York Marine and General Insurance Company.
The plaintiff was having lunch with her daughter, a friend (Ms. Rhoda Ray), and two elderly ladies who died prior to trial. The plaintiff, who admitted to having had two glasses of champagne and to wearing high heels, visited the dessert bar and was returning to her table carrying a full plate in each hand. She was required to descend a flight of six stairs to return to her table. Because of the presence of other patrons, she did not use the handrail to balance herself. On the top step, she slipped and fell down the steps to the lower level. Although she had not seen anything on the top step either upon her assent or as she began to descend the stairs, she maintained that she saw a clear substance on the top step from her position at the bottom of the stairs. At trial she estimated the substance as being four inches in diameter; however, she retreated from that estimate on cross-examination,2 agreeing with her estimate given at her deposition that the substance was approximately the size of a quarter or half-dollar coin.
Later that afternoon, Ms. Valley went to the emergency room complaining of pain in her head, neck and leg. In 1989, she was diagnosed with cervical facet arthropathy and underwent a cervical branch neurotomy. In 1991, she was diagnosed with lumbar facet arthropathy and underwent a lumbar neurotomy, which was repeated in 1992. In 1993 she was diagnosed with herniated discs at L4-5 and L5-S1; she underwent a laminectomy and fusion. In 1995, she was diagnosed with a disc bulge at C5-6. A laminectomy and fusion were performed in that same year. She maintains that she has a 25 to 50% total body disability and residual back pain.
Prior to trial in September of 1991, Specialty entered into a "Mary Carter" agreement *1031 with the plaintiff. In exchange for a promissory note of $175,000.00, the plaintiff agreed to give a $250,000.00 "credit" to any future award and to reimburse Specialty up to $60,000.00 with proceeds from an award of more than $250,000.00. The award was limited to $750,000.00. New York Marine, the restaurant's insurer, was not a party to the agreement. The restaurant was self-insured up to $250,000.00 with New York Marine covering the excess. New York Marine was the only defendant that appeared at trial.
The district court awarded the plaintiff $350,000.00 in general damages, $139,703.29 in past medical expenses, and $35,147.00 in future medical expenses. The court found the plaintiff 25% at fault and the defendants 75%. The court further ordered that the defendants were entitled to a credit of $217,020.18, which was the amount of $250,000.00 minus the defense costs incurred by Specialty. New York Marine appeals the district court's judgment; Ms. Valley has answered the appeal.[1]

Standard of Review
The appellant first asserts this court must conduct a de novo review of all issues raised, rather than apply the manifest error standard of review, because the district court erred in applying the evidentiary burdens set forth in McCardie v. Wal-Mart Stores, Inc., 511 So.2d 1134 (La.1987), which was legislatively overruled by La.Rev.Stat. 9:2800.6. We agree, in part, for the reasons that follow.
In McCardie, the court held that, after proof by a plaintiff that a foreign substance on the floor caused her to slip, fall, and sustain injuries, a merchant may exculpate itself from the presumption of negligence if it proves that its employees did not cause the hazard and that it exercised such a degree of care that it would have known under most circumstances of a hazard caused by customers. McCardie, 511 So.2d at 1135 (quoting Brown v. Winn-Dixie Louisiana, Inc., 452 So.2d 685, 687 (La.1984)).
In 1988, the legislature overruled McCardie when it enacted La.Rev.Stat. 9:2800.6 by Acts 1988, No. 714, § 1. Manieri v. National Tea Co., 573 So.2d 1268, 1271 (La.App. 4 Cir.1991). The statute was entitled, "Liability of a merchant for injuries sustained by a person while on the premises of the merchant," and provided as follows:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a suit for damages by a person who has suffered damages as the result of a hazardous condition while on the merchant's premises, the person must prove that the accident was caused by a hazardous condition. The burden of proof then shifts to the merchant to prove that he acted in a reasonably prudent manner in exercising the duty of care he owed to the person to keep the premises free of any hazardous conditions.
C. In exculpating himself from liability under this Subsection, the merchant need not introduce the testimony of every employee of the merchant or any particular proportion thereof, but is only required to introduce the testimony of any employee shown to have actually created the hazardous condition and those employees and management personnel whose job responsibilities included inspection or cleanup of the area where the accident giving rise to the damages occurred.
D. "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business.
Section 2 of Acts 1988, No. 714, provided in pertinent part:
This Act shall become effective upon signature by the governor... and shall apply to all cases tried on or after such date.
The governor approved Act 714 on July 18, 1988; therefore, the statute applied to all cases tried on or after July 18, 1988.
By Acts 1990, No. 1025, § 1, the legislature amended La.Rev.Stat. 9:2800.6 and rewrote *1032 Sections B and C, further revising the burdens of proof of the plaintiff and the merchant defendant. This amendment, however, was to be applied prospectively only to causes of action that arose "on or after the effective date of this Act," which was September 1, 1990. Acts 1990, No. 1025, § 2.
In 1996, the legislature again amended La. Rev.Stat. 9:2800.6, which is now entitled "Burden of proof in claims against merchants." Acts 1996, 1st Ex.Sess., No. 8, § 1. Under Section 2 of the Act, its provisions apply "only to those causes of action arising on or after the effective date of this Act." The Act became effective on May 1, 1996, and remained in effect through the date of trial in the instant matter.
The district court refused to apply the 1988 version of the statute, reasoning that the subsequent amendments limited the 1988 version to those cases tried before the first amendment became effective on September 1, 1990. The plaintiff makes this argument, as well, characterizing the period from July 18, 1988, to September 1, 1990, as a "window" during which the 1988 version applied to cases tried therein. Although the plaintiff cites Davis v. Wal-Mart, Inc., 594 So.2d 557, 561 n. 1 (La.App. 2 Cir.), writ denied, 600 So.2d 608 (La.1992), in support, that decision is not factually relevant, because the trial in that case was conducted before the 1990 amendment. There, the court, without citing any authority, opined in a footnote that McCardie would apply to any case tried after September 1, 1990, in which the cause of action arose before that date.
We find the dicta in Davis unpersuasive in light of the legislature's clear wording in Section 2 of Acts 1988, No. 714, that the Act is to be applied to all cases tried after the effective date of July 18, 1988. Furthermore, no language in the subsequent amending acts of 1990 and 1996 suggests the legislature has retreated from its objective to eliminate the McCardie burdens of proof. The Second Circuit has also disagreed with the Davis discussion. See Hickman v. Albertson's, Inc., 598 So.2d 1128, 1131 n. 1, (La.App. 2 Cir.), writ denied, 600 So.2d 618 (La.1992). There, the case arose in 1988 and was tried in 1991, after the effective date of the 1990 amendment. The Hickman court found the 1988 version of the statute applicable. Likewise, we conclude the statute as it was enacted in 1988 superceded McCardie and applies to any case tried after July 18, 1988, in which the cause of action arose before September 1, 1990. Accordingly, we find that the district court erred in applying the burdens of proof set forth in McCardie, instead of those delineated in La.Rev.Stat. 9:2800.6 as it was enacted in 1988.
Because the district court as the fact-finder failed to apply the most important legal principle governing the outcome of this case, i.e., the merchant's burden of proof, the finding of the district court that the defendant restaurant failed to exculpate itself from liability must be set aside. Because the complete record is before us, we will review the record de novo and render judgment on the merits of this issue only, rather than remand the case to the district court. See Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975); see also Manieri, supra; Davis, supra.
Other than the issue of the merchant's burden of proof, we will apply the manifest error or clearly wrong standard to the factual findings of the district court, such as the court's determination that the accident was caused by a hazardous condition on the merchant's premises. See Manieri, 573 So.2d at 1272, n. 4. Under this standard, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony or the facts. Stobart v. State of Louisiana Through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). Notwithstanding, the reviewing court has a constitutional duty to review facts and to determine if the facts support the trial court's judgment. Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221. However, the reviewing court must keep in mind that, even if it would have decided differently had it been the trier of fact, the trial court's judgment should be affirmed unless it is clearly wrong or manifestly erroneous. Id.

*1033 Hazardous Condition

Under La.Rev.Stat. 9:2800.6 B as enacted in 1988, the plaintiff was required to prove the accident was caused by a hazardous condition. The district court found that Ms. Valley had proved by a preponderance of the evidence that a hazardous condition existed in the restaurant and that this condition caused her to fall.
The evidence supports the district court's conclusion that a hazardous condition on the steps caused the plaintiff's fall. The six steps were approximately five feet in width, according to the manager. The right side, as one ascends the stairs, had a handrail. According to the plaintiff's testimony, the left side, from that same direction, did not have a handrail, but it did have a ledge along the bottom of a banister that could have served as a handrail. Ms. Valley testified that she ascended the flight of stairs on the right side to go to the dessert buffet located on the upper level. She did not see anything on the top step at that time. As she was descending the steps on the left side holding plates in both hands, her foot slipped out from under her as she stepped on the top step. She then fell to the bottom of the steps, where she ended up with her left leg underneath her. Although she did not see anything on the top step at the moment she slipped, Ms. Valley testified that she could see a substance, along with the desserts she had spilled, on the top step from her position at the bottom of the stairs. She described the substance as clear water or liquid, approximately four inches in size.
On cross-examination, Ms. Valley admitted that she did not know whether she had slipped on anything, but she insisted that she had to have slipped on something. She denied stumbling because of her high-heeled shoes. She also denied being intoxicated, though she had consumed two glasses of complimentary champagne. She admitted that in a prior deposition she had estimated the size of the substance as equivalent to the size of a quarter or a half-dollar coin. She stated she could see the substance from her position, because the liquid was "raised" and "puddle-like."
The restaurant's general manager, Derrick Todd, replied affirmatively when asked by plaintiff's counsel if he recalled a clear substance on the floor toward the top step. Later, when questioned by defense counsel, he stated that he had not seen anything on the steps just prior to the accident. He explained his previous testimony as follows:
A: I think I was trying to explain the fact that it seemed to be a watermark. In reading over my deposition, I stated the fact that it was clear. The point is, I didn't recognize the substance or to say that it was a substance. I was just making an assumption that it looked like something had been there.
Q: There was a mark on the stairs?
A: A mark on the stairs.
Q: After the accident, did you examine the stairs?
A: Yes.
Q: Did you see a foreign substance on the stairs?
A: No.
Q: Had any clean up taken place?
A: I honestly don't know.
Ms. Rhoda Ray, the plaintiff's estranged friend, testified that she had not seen anything on the steps either upon her ascent to the upper level of the restaurant or on her descent to the level on which the party's table was located. She had preceded Ms. Valley both up the stairs and, by several minutes, down the stairs. She denied having seen waiters on the stairs after she descended the stairs and before Ms. Valley did so.
In finding for the plaintiff, the district court observed that Mr. Todd "testified that the liquid found on the stairs was clear....." According to the court, Ms. Valley "testified that she looked at the stairs before she stepped on them and fell... and that she saw no foreign substance on the stair before her fall." On this evidence, the court implicitly found that Ms. Valley had proved she had slipped and fallen on a foreign substance.
Though it is a close call, we cannot say that the court's finding was manifestly erroneous or clearly wrong. Aside from conflicts in some details, Ms. Valley consistently testified that she saw a clear liquid on the top *1034 step after her fall, while Mr. Todd certainly testified that after the fall he saw a watermark on the top step from which Ms. Valley claimed she had slipped. From this evidence, the trier of fact could have rationally concluded that Ms. Valley had proved by a preponderance of the evidence that a foreign substance located on the top step had caused her to slip and to fall to the bottom of the stairs. That the district court did so was not manifestly erroneous.

Restaurant's Duty
The appellant next claims the district court erred in concluding that it did not exculpate itself from liability. As discussed above, we will consider the merits of this issue after a de novo review of the record.
Under the 1988 version of La.Rev. Stat. 9:2800.6 C, the defendant merchant need not introduce the testimony of every employee or any particular proportion thereof. The merchant must do no more than to introduce the testimony of any employee shown by the plaintiff to have actually created the hazardous condition and those employees, including management personnel, who had inspection and/or clean-up responsibility in the area of the accident. Manieri, 573 So.2d at 1271; Davis, 594 So.2d at 562.
In Manieri, the merchant introduced the testimony of the employee and the manager responsible for inspecting or cleaning the aisle in which the plaintiff fell. The store manager described the store's inspection policies and practices. He stated he had sent an employee to clean the aisle of a spill ten minutes before the accident. The employee confirmed this testimony. He stated he had mopped and dried the aisle floor approximately three minutes before the accident. Four minutes after completing the job, he was called back to clean another spill in the same location he had just cleaned. After reviewing the testimony de novo, this court concluded the merchant had not breached its duty to exercise reasonable care to keep its aisles, passageways and floors in a reasonably safe condition.
In Davis, the appellate court, also reviewing the evidence de novo, found the merchant had exculpated itself from liability. There, the trial testimony established that, in addition to opening and closing clean-up measures and spot cleans, the merchant had three other programs or procedures directed at store cleanliness and customer safety. The "Safety Committee," a group of employees, weekly inspected the store for potential hazards. A "Zone Defense" program consisted of two to four checks a day by employees assigned to specific areas. The "Safety Sweep" program consisted of specified employees who were designated to sweep the aisles several times a day. The latter two programs required the employee to divert his attention from his regular duties and to devote his or her exclusive attention to the floor in the assigned area. Further, all employees were to be on the lookout for spills or other unsafe conditions during their shifts. Finally, the merchant had an incentive program to combat spills, requiring the employee to stay at the location of the spill until it was cleaned up. Given these procedures, the court concluded that the merchant's efforts in the area of customer safety were more than reasonable and, therefore, sufficient to exculpate it from liability in connection with the plaintiff's accident.
In the instant case, the plaintiff did not show that a particular employee had created the hazardous condition; therefore, to exculpate itself from liability, the defendant restaurant was required to prove that it had not breached its duty to exercise reasonable care in keeping its aisles, passageways and floors in a reasonably safe condition. To satisfy that burden, the restaurant's general manager explained the restaurant's policy for spills:
A: It was a constant because of the numerous steps and different levels in the restaurant. It was a constant situation where the hostesses either would tell busboys or...waiters would pick up their own. We constantly monitored the steps. It was as big an issue as getting the doors open in the morning, probably.
Q: How would the hostesses monitor?
A: They were required to seat people, so they had to go in and out of each dining room. So they were the ones who most consistently went in and out of each *1035 dining room, [and] who would not have made the error of putting something on the floor. So they were the ones. In other words, if a guy made a mistake, he may not be inclined to admit it. The hostess was looking for trouble. That was her function, to seat people and make sure that our floors were straight.
Q: That was a policy that you communicated to your hostesses?
A: Sure.
Q: How was that policy communicated to the employees of Algiers Landing?
A: Different meetings, monthly meetings. It was a constant situation.
Q: These meetings were run by you?
A: Yes, sir.
Q: Were there any particular employees designated to clean the floor?
A: No, not anyone in particular. It was a general duty of everyone. I myself carried a towel over my shoulder and I would use it in a heartbeat to get something solved. It was dangerous. The employees wore hard-soled shoes and we used to fly around there.
Q: So the policy was as much for the protection of your employees as well as the customers?
A: Yes.
Whether a merchant's protective measures are reasonable is determined in light of the circumstances of each case, along with the risk involved, the merchant's type and volume of merchandise, the type of display, the floor space used for customer service, the volume of business, the time of day, the section of the premises, and other such considerations. Thompson v. Stalnaker's Restaurant, Inc., 93-1447, pp. 4-5 (La.App. 3 Cir. 6/1/94), 640 So.2d 733, 736, writ denied, 94-1799 (La.10/14/94), 643 So.2d 165. The duty that self-service stores owe their patrons to minimize risks by frequent inspections and clean-ups also applies to self-service type restaurants where customers are required to carry their own food. Bordelon v. Wendy's of New Orleans, 553 So.2d 922, 925 (La.App. 4 Cir.1989), writ denied, 558 So.2d 1129 (La.1990); see also Thompson v. Stalnaker's Restaurant, Inc., supra, at p. 5, 640 So.2d at 736-37.
We find the testimony introduced by the defendant restaurant to be inadequate to exculpate itself from liability. As the testimony revealed, and the restaurant's manager stated, the layout of the restaurant's facility presented a dangerous situation. There were different levels requiring patrons to traverse stairs to reach buffet tables and to return to their dining tables holding plates of food. Waitservice personnel, who carried water, and busboys were required to negotiate this terrain and avoid patrons walking to and from the buffet tables. Furthermore, the restaurant, which provided complimentary champagne to patrons, was very busy for the Mother's Day brunchthough Ms. Valley's accident occurred around three o'clock in the afternoon when the crowds had thinned out.
Whether or not the restaurant's spill policy should have been in writing, the policy as described by the manager was not reasonable under the circumstances of this case. As in Thompson, which also involved a restaurant offering buffet service, the restaurant's duty of care, the physical conditions of the Algier's Landing restaurant, and the heavy traffic brought on by the Mother's Day brunch made it necessary to assign a particular employee who would be responsible, and accountable, for actively and specifically checking the floors and steps of the restaurant. Although the manager testified that the hostesses were in the best position to check the floors for spills, because they traveled throughout the premises to seat patrons, there is no indication that the hostesses regularly or specifically checked the floors and stairs for spills. Nor did the manager state the number of hostesses on duty that day. Because the inspections by the hostesses depended entirely upon whether they happened to be seating someone in a particular area, the inspections were by definition irregular, if not sporadic.
Perhaps most tellingly, no hostess, nor any other employee for that matter, testified as to how, or even if, she had performed inspections of these steps for spills on the day of the fall. The applicable version of La.Rev. *1036 Stat. 9:2800.6 C minimally requires that those employees, not just management personnel, responsible for inspecting or cleaning-up the particular area be called to testify. In Manieri, for example, the store manager and the clerk who had cleaned the floor testified as to the clean-up procedures used in the merchant's store that day. Here, the defendant restaurant failed to present the testimony of the actual employees involved in carrying out the spill policy as outlined by the manager. Consequently, given the particulars of this restaurant, especially on the day of the accident, we do not believe the defendant restaurant proved by a preponderance of the evidence that its spill policy was sufficient to satisfy its duty to exercise reasonable care to keep its aisles, passageways and floors in a reasonably safe condition. Accordingly, we conclude the defendant restaurant failed to exculpate itself from liability as required by La.Rev.Stat. 9:2800.6 C as enacted in 1988.

Comparative Fault
The appellant next asserts the district court erred in assigning only twenty-five percent of the fault to the plaintiff. The appellant argues that the plaintiff, an overweight woman who had consumed at least two glasses of champagne and was wearing two-tothree-inch spiked heels, chose to descend a flight of stairs while holding plates of food in both hands, rather than carry only one plate of food and wait until the stairs were clear so that she could use the side with the handrail. The appellant contends the plaintiff should have been held at least eighty-five percent responsible for the accident. The plaintiff answered the appeal asserting the district court erred in assessing any fault to her.
The factfinder's allocation of fault may not be adjusted unless clearly wrong. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96), 666 So.2d 607, 610-11.
While we might disagree with the percentages of fault apportioned by the district court judge, we cannot conclude from the evidence that the court was clearly wrong in assessing only twenty-five percent of the fault to the plaintiff. The restaurant was certainly aware that a Mother's Day brunch would attract women wearing high-heeled shoes, who might be overweight, and who might be unsteady on their feet after drinking complimentary champagne as they tried to negotiate flights of stairs while carrying plates of food. Further, aware of these possibilities, the restaurant was in a better position to minimize the risks to its patrons by instituting a regularized and certain procedure to inspect for and to clean up spills occasioned by its patrons or restaurant personnel. On the other hand, the plaintiff could have waited to descend the stairs on the side with the handrail and could have only carried one plate of food at a time; however, she chose to take the risk of descending the stairs without taking ordinary precautions to prevent a fall. The district court was not clearly wrong in assessing the plaintiff with twenty-five percent of the fault and the restaurant with the remaining seventy-five percent.

$250,000 Settlement Credit
The appellant claims the district court erred in deducting defense costs from the $250,000.00 credit stemming from the settlement agreement between the plaintiff and Specialty Restaurant. We agree that the district court should have awarded a credit for the full amount of the settlement.
Provision III of the settlement agreement signed by the plaintiff and Specialty Restaurant provided as follows: "Defendants are granted a credit in the amount of $250,000.00 against any gross judgment proceeds which may become due to plaintiff." The agreement defined "gross judgment" or "gross judgment proceeds" as:
the gross amount due under any judgment rendered herein including principal, interest, court costs and any other sums recoverable under such judgment. In addition, the said amount shall also include the amounts of any legal fees and loss adjustment expenses credited to the Defendants Retained Limit by it's [sic] insurer.
Essentially, the settlement agreement provided for three payments totaling $175,000.00 to the plaintiff by Specialty Restaurant in exchange for (1) a credit of $250,000.00 in favor of the defendants against any judgment *1037 rendered, (2) a $750,000.00 limit on the total amount recoverable by the plaintiff, and (3) a payment to, or a credit in favor of, Specialty Restaurant in the amount of one-half of the excess proceeds, not to exceed $60,000.00, should the plaintiff obtain a judgment in excess of $250,000.00.
Under the plain wording of the agreement, the defendants were entitled to a credit of $250,000.00, inclusive of interest, legal fees, and loss adjustment expenses. Therefore, the district court clearly erred in deducting from the $250,000.00 credit the defense costs of $32,979.82 incurred by Specialty Restaurant.[2]
Accordingly, we amend the judgment, which originally awarded a credit of $217,020.18, to provide for a credit to the defendants in the amount of $250,000.00.

Pre-Judgment Interest
In the next claim, the appellant argues that the district court, on October 1, 1997, erred in denying its motion for clarification of the judgment and/or motion for new trial with respect to the calculation of prejudgment interest. The appellant had requested the district court order that the twenty-five percent reduction in the award corresponding to the plaintiff's fault and the settlement credit be deducted from the award prior to the calculation of pre-judgment interest. The appellant argues that the settlement credit should include any interest thereon, because the plaintiff did not specifically reserve her right to pre-judgment interest in the agreement. We agree the judgment requires clarification to provide that the settlement credit of $250,000.00 includes any pre-judgment interest thereon.
Under La. Civ.Code art. 2925, "[t]he release of the principal, without any reserve as to interest, raises the presumption that it also has been paid, and operates a release of it." In interpreting Article 2925, the Supreme Court held that "[w]here the injured party elects to compromise his claim against one solidary obligor, he must either simultaneously assert his claim to judicial interest or expressly reserve his rights thereto." Martin v. Champion Ins. Co., 95-0030, p. 14 (La.6/30/95), 656 So.2d 991, 999; see also Pugh v. Gondrella, 522 So.2d 1257, 1259 (La. App. 4 Cir.1988).
In this case, the settlement agreement specifically provides that the defendants are entitled to "a credit in the amount of $250,000.00 against any gross judgment proceeds which may become due to Plaintiff," as well as to other considerations, in exchange for the payment of $175,000.00. By the definition set forth in the agreement, "gross judgment proceeds" includes principal and interest. Under the plain meaning of the agreement, then, the plaintiff relinquished her right to interest on the amount credited to the defendants. Further, because there is no express language in the settlement agreement, or elsewhere, that the plaintiff wished to reserve her right to interest on the credit she granted to Specialty Restaurant, any rights she had to recover interest on that amount were waived. See Martin, supra; Pugh, supra.
We disagree with the plaintiff's argument that the term "principal" in Article 2925 refers to the settling party, rather than the monetary amount of the debt released under the compromise. Such an interpretation would render the article nonsensical.
We also disagree with the plaintiff's contention that the so-called "Mary Carter" agreement was not a compromise. The plaintiff essentially argues that the "credit" under the agreement was not a compromise or settlement, but an "advance" on any gross judgment proceeds eventually obtained by judgment. The plaintiff points out that Specialty Restaurant was not dismissed from *1038 the litigation and, therefore, remained a judgment debtor. Notwithstanding this argument, the nature of the agreement in question remains one of compromise. Specialty Restaurant, in light of its self-insured retention policy, ostensibly obtained the benefit of total release from its liability to the plaintiff, i.e., the retained limit of $250,000.00, and secured the distinct benefit of an opportunity to recoup up to $60,000.00 more from any judgment proceeds exceeding $250,000.00, in exchange for payments to the plaintiff totaling $175,000.00. Moreover, even if Specialty Restaurant remains a judgment debtor, it paid $175,000.00, and secured the possibility of recovering up to $60,000.00 of that payment, in exchange for the release of $250,000.00 in liability. Thus, Specialty Restaurant would have obtained release of $250,000.00 in exposure for paying as little as $115,000.00. Whether the release of this amount of liability is labeled a "credit" toward a future judgment, it remains a settlement proceed on which the plaintiff failed to reserve her right to judicial interest.
In sum, we find that the district court erred in denying the appellant's motion to clarify the judgment with respect to any prejudgment interest owed on the credited amount. We thus amend the judgment to reflect that the amount of $250,000.00 credited to the defendants includes any pre-judgment interest thereon.

Causation
The appellant argues the district court erred in finding the plaintiff had proved that the fall in May of 1988 was the cause of the herniated lumbar disc, diagnosed in 1993, and the bulging cervical disc, diagnosed in 1995. Because the expert testimony supported a finding that the lumbar and cervical disc damage requiring surgical treatment in 1993 and 1995 was causally related to the fall in 1988, we find no manifest error in the district court's judgment on causation.
The plaintiff's medical history is briefly summarized as follows: Prior to her fall in May of 1988, the plaintiff had reported no problems with her back and only a minor problem with her neck, the latter in 1975. On the day of the accident, she (presented to an emergency room complaining of pain in her foot, leg, and arm. Thereafter, she saw her family physician, Dr. Nicholson, who referred her to an orthopedist. The plaintiff began seeing Dr. Kewalramani, a doctor of physical medicine and rehabilitation, in June of 1988. To Dr. Kewalramani, the plaintiff complained of radiating pain in her arms and legs and pain in her neck and lower back. A cervical MRI, a cervical CT scan, and a cervical facet arthrogram were conducted in 1989. No disc herniation or bulging was reported; however, Dr. Vogel, a neurosurgeon, diagnosed cervical facet arthropathy and recommended a cervical branch neurotomy, which he performed in October of 1989.
In the spring of 1991, Dr. Saul, a radiologist who did not testify at trial, performed a lumbar MRI, a lumbar discogram and CT scan, and a lumbar facet arthrogram at Mercy Hospital. Although Dr. Saul reported no evidence of disc herniation, Dr. Kewalramani and Dr. Aprill, a spinal radiologist, saw evidence in the films of possible protrusive lesions. Given the plaintiff's continued symptoms, Dr. Vogel diagnosed lumbar facet arthropathy and performed a lumbar neurotomy. In April of 1992, Dr. Aprill performed a lumbar myelogram and CT scan. The CT scan revealed clear herniation of the disc at L4-5 and an irregular bulge at L5-S1. Dr. Vogel repeated the lumbar neurotomy in June of 1992.
In 1993, the plaintiff began to see Dr. Whitecloud at Tulane Hospital. A lumbar MRI, performed in November, and a lumbar myelogram and CT scan, performed in January of 1994, revealed evidence of disc hernitation at L4-5 and L5-S1. Dr. Whitecloud performed a laminectomy and fusion at those levels.
In April and May of 1995, the plaintiff underwent a cervical MRI and a cervical discogram. These tests showed bulging of the discs at the C4-5 and C5-6 levels. Dr. Whitecloud performed a laminectomy and fusion at these levels in July of 1995.
Dr. Whitecloud, who performed the cervical and lumbar disc fusions opined that the cause of the plaintiff's lumbar and cervical disc problems originated between 1989 and *1039 when he first saw Ms. Valley in 1993. He based his opinion on the fact that the cervical MRI and cervical CT scan performed in 1989 were reported as revealing no evidence of disc herniation. However, he stated that he would defer to the opinions of the physicians who had treated the plaintiff since the date of the accident and during the period before he first saw the patient.
Dr. Steiner, an orthopedist, testified that it was his opinion that the plaintiff did not have any cervical or lumbar disc herniation when he examined her in March of 1990. In July of 1991, when he examined the plaintiff again, he found no change in her condition. He based his findings on x-rays taken by him and diagnostic studies performed by other physicians. He believed that the cervical and lumbar neurotomies plaintiff had undergone in 1989 and 1991, respectively, were based on subjective complaints of the patient and not objective diagnostic findings. On cross-examination, however, he admitted that he had only read the summaries of other studies instead of making an independent examination of the data obtained.
Dr. Kewalramani first treated the plaintiff in June of 1988, initially prescribing physical therapy, as well as anti-inflammatory and pain medication. Although an MRI of the cervical spine conducted in February of 1989 revealed no evidence of herniation of the disc at any level, he suspected nerve root impingement, because the plaintiff's symptoms were typical. He believed that the nerve root damage originated with the accident in May of 1988. He referred the plaintiff to a neurosurgeon. A cervical CT scan performed in July of 1989 showed disc damage at the C4-5 and C5-6 levels, which were later operated on by Dr. Whitecloud. This test, according to Dr. Kewalramani, supported a conclusion that the plaintiff had sustained cervical disc damage in the May 1988 accident. Dr. Kewalramani explained that an MRI is one dimensional and that a combination of tests will result in a better diagnosis.
Dr. Kewalramani also testified with regard to the lumbar disc damage. He noted that the plaintiff had reported symptoms of nerve damage, constant lower back pain with radiation into the legs, since the accident in May of 1988. In October of 1988, he noted tenderness at the L4-5 and L5-S1 levels, where the fusion was ultimately performed. He believed that the mechanical dysfunction was in the form of either a facet arthropathy or disc pathology. He believed the cramps in Ms. Valley's legs were symptoms of lower level nerve pinching. He advised her to see a neurosurgeon in April of 1989. Dr. Kewalramani reviewed the lumbar studies done in 1991 and 1992, as well as the findings of Dr. Whitecloud in 1993. Dr. Kewalramani, noting that the plaintiff had corresponding symptoms since the trauma in May of 1988, opined that the three back surgeries were more likely than not the result of the 1988 fall. He noted that the lack of success obtained by the lumbar neurotomies suggested that the nerve impingement was not at the facet or joint level but somewhere else, such as at the disc level.
Dr. Nicholson, the plaintiff's family physician, testified that he had treated her after the accident. He, too, believed that the plaintiff's symptoms originated with the accident.
Dr. Aprill's testimony was rather compelling in favor of the plaintiff. Using a slide projector to show the films of various tests administered to the plaintiff, he explained how the earlier images were consistent with the later images. With respect to the lower back, he believed that the MRI of February 1991 and the discogram of April 1991 both revealed possible fissures at the L4-5 and L5-S1 levels. He did not see any abnormality of the facets or joints, though the complaints of pain were indicative. Although these fissures could be degenerative or traumatic in origin, he believed that the lumbar disc damage was consistent with a the fall in 1988 and the patient's history of mechanical pain. The myelogram and CT scan performed in 1992 also showed disc abnormality at the L4-5 level. Dr. Aprill believed that this study was better detailed than the earlier studies, and showed subtle, but persistent and continuing, signs of disc abnormality.
Dr. Aprill displayed for the court the MRI scan performed in 1993. He pointed out the disc protrusion at the L4-5 level. He stated *1040 that an x-ray of the lumbar spine taken in the same time frame revealed no bone changes suggesting that the patient's disc pathology was degenerative in origin. He also explained how the patient's changes in pain complaints corresponded with the steady progression of the abnormality in the disc. He stated that it was his opinion in 1992 that the plaintiff's lower back problems were the result of the injury sustained in the fall of May 1988. He believed that the lumbar disc fissures were more likely than not traumatic in origin.
Dr. Vogel, the neurosurgeon, first saw the plaintiff in July of 1989. At that time, Ms. Valley reported lumbosacral and right leg pain, plus cervical and left arm and shoulder pain. He observed a one-hundred-pound difference in grip strength between the left and right sides, when a normal difference would be twenty to thirty pounds. In his opinion, the cervical CT scan performed in July of 1989 revealed bulges in the C4-5 and C5-6 levels, consistent with her reports of pain. An arthrogram at those levels provided relief for two hours. A left cervical neurotomy was performed in October of 1989, followed by both cervical and lumbar physical therapy. Dr. Vogel stated that the 1991 lumbar MRI and CT scan revealed bulges at the L4-5 and L5-S1 levels. He performed a lumbar neurotomy in May of 1991. The patient continued to have pain. Dr. Vogel stated that the myelogram/CT scan performed in April of 1992 revealed abnormalities at the L4-5 and L5-S1 levels. Thereafter, the lumbar neurotomy was repeated. Dr. Vogel admitted that the neurotomies did not provide persistent relief at either the lumbar or cervical levels. Dr. Vogel opined that, in all medical probability, the plaintiff's symptoms were causally related to the fall in May of 1988.
In light of this evidence, we find no manifest error in the district court's finding that the 1993 and 1995 surgeries resulted from the fall in May of 1988.

General Damages
The appellant last asserts that the district court abused its discretion in awarding the plaintiff $350,000.00 in general damages. It argues that this court should assess damages de novo, because the district court erred in finding that the restaurant was at fault in causing the plaintiff's damages and that the disc damage resulted from the fall. The appellant contends the district court should have awarded the plaintiff no more than $200,000.00.
We find that the district court's erroneous application of McCardie did not affect its findings on the amount of damages proved by the plaintiff. See Picou v. Ferrara, 483 So.2d 915, 918 (La.1986); Kennedy v. St. Charles General Hospital Aux., 630 So.2d 888, 895 (La.App. 4 Cir.1993), writ denied, 94-0269 (La.3/18/94), 634 So.2d 863. Consequently, we will review the issue of damages under a manifest error or clearly wrong standard.
An appellate court should not disturb an award unless it is an abuse of discretion. Guillen v. Transit Management of Southeast Louisiana, 94-0947 (La.App. 4 Cir. 12/28/94), 648 So.2d 487. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the great discretion of the trier of fact. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). General damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors that affect the victim's life. Delphen v. Dep't of Transp. and Dev., 94-1261, pp. 13-14 (La.App. 4 Cir. 5/24/95), 657 So.2d 328, 336, writs denied, 95-2116, 95-2124 (La.11/17/95), 663 So.2d 716, 717.
In this case, the plaintiff underwent three back surgeries and two neck surgeries as a result of her fall in the defendant's restaurant in May of 1988. In 1996, she suffered constant neck pain and nighttime numbness and tingling in her left arm. She continued to have sharp back pain and spasms in her back and legs. She was unable to get comfortable or to sleep at night. In 1997, she continued to have neck pain with radiation to the left arm, and increased pain with pushing, pulling, and lifting. No further improvement is expected. Because her back *1041 spasms have continued, she must undergo physical therapy and take pain muscle relaxants and vitamin B12. At night, she suffers painful cramps in the back and leg, requiring her to get out of bed and walk around. Her left leg also gives out on occasion. She has permanent functional limitations that include difficulty standing, sitting, bending, and walking more than thirty to forty-five minutes. She has a total and whole body impairment of fifty percent.
Considering the testimony as to Ms. Valley's medical history and condition at the time of trial, we cannot conclude that the district court abused its discretion in awarding the plaintiff $350,000.00 in general damages.

Lost Earning Capacity
The plaintiff answered the appeal complaining that the district court erred in refusing to award her damages for lost earning capacity. She points out that a vocational expert testified that she had a wage earning capacity of $5.00 per hour. This witness also indicated that Ms. Valley's work limitations were primarily related to her lower back problems. He did not believe that she was capable of returning to any level of employment.
Loss of past and future income is not merely predicated upon the difference between a plaintiff's actual earnings before and after a disabling injury, but upon the difference between a plaintiff's earning capacity before and after the injury. Brown v. Southern Baptist Hospital, 96-1990, 96-1991, pp. 12-13 (La.App. 4 Cir. 3/11/98), 715 So.2d 423, 431-32, writs denied, 98-0959, 98-0986, 98-1086, 98-1348 (La.5/29/98), 720 So.2d 335, 343, 672. Some of the factors to consider when making an award for loss of earning capacity include: plaintiff's physical condition before the accident, plaintiff's work record before and after the accident, amounts earned in previous years, inflation, and the probability that, except for the injury, the plaintiff would have earned similar wages the rest of his life. Id., p. 13, 715 So.2d at 432. The jury's findings as to lost earnings may not be disturbed on appeal absent a finding that they were without foundation or were clearly wrong. Id.
Here, Ms. Valley admitted that she had not worked for three years prior to the accident. She testified that she had worked as a cook for a short period of time after the accident, but she explained that the pain she suffered as the result of the fall prevented her from performing this type of work. At the time of the accident, she had applied for disability payments on account of ischemic heart problems. Six months after the accident, her application was granted retroactively and she began receiving disability payments. Although she stated that her heart problems had lessened with medication, at the time of trial, some nine years after the accident, Ms. Valley admitted she was still receiving disability payments because of her heart condition. No medical expert testified that Ms. Valley's heart condition had improved or that the condition would not prevent her from returning to work.
On this evidence, the district court reasonably found that Ms. Valley had suffered no loss of earning capacity. Because of her heart condition, unrelated to the fall, the plaintiff possessed no earning capacity either before or after the accident. At the time of trial, Ms. Valley admitted she was still receiving disability payments for her heart condition; therefore, her lack of earning capacity continued at least until that time. The district court's conclusion on this issue was not clearly wrong.

Conclusion
For the reasons set forth above, we amend the judgment, which originally awarded a credit of $217,020.18, to provide for a credit to the defendants in the amount of $250,000.00. We further amend the judgment to reflect that the amount of $250,000.00 credited to the defendants includes any pre-judgment interest thereon. In all other respects, the judgment is affirmed.
AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] The answer was filed in the record below on December 1, 1997. Rec., Vol. III, p. 533.
[2] The insurance policy issued by New York Marine, the appellant, to Specialty Restaurant provides for a self-insured retention, or retained limit, of $250,000.00, including all legal fees and loss adjustment expenses. However, the policy apparently provides for a possible reduction in the retained limit equal to any legal fees and loss adjustments costs incurred by the insured, if the insured obtains prior authorization to incur such expenses and satisfies other specified duties under the policy. Although New York Marine alleges that Specialty Restaurant is not entitled to a reduction in the retained limit, that dispute is not presently before us. In short, the insurance policy between New York Marine and Specialty Restaurant is not immediately relevant to our interpretation of the settlement agreement between Specialty Restaurant and the plaintiff.