875 So.2d 124 (2004)
Sheldon ANDRUS
v.
L.A.D. CORPORATION, De Auduong, Acceptance Insurance Company and ABC Insurance Company.
No. 03-CA-1488.
Court of Appeal of Louisiana, Fifth Circuit.
May 26, 2004.
Rehearing Denied July 13, 2004.
*125 Stephen N. Elliott, Howard B. Kaplan, Francine Giugno, Bernard, Cassisa, Elliott & Davis, Metairie, LA, for Appellants.
Richard J. Dodson, Kenneth H. Hook, III, Dodson & Hooks, APLC, Baton Rouge, LA, for Appellee.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS and WALTER J. ROTHSCHILD.
JAMES L. CANNELLA, Judge.
The Defendants, L.A.D. Corporation (L.A.D.) and Acceptance Insurance Company, appeal from the trial court judgment rendered in favor of the Plaintiff, Sheldon Andrus (Andrus), holding the Defendants liable for damages that Andrus suffered in the amount of $30,443.84. For the reasons which follow, we reverse.
*126 Andrus filed suit against the Defendants[1] alleging that he had suffered severe injuries on August 13, 2000 from a dog attack. He alleges that he was a patron at De Auduong's (Auduong) service station. He stated that he had walked over to the dumpster on the side of the building to dispose of trash. A dog, Princess, owned by L.A.D., is kept behind the fence next to the dumpster for security of the rear of the premises. Andrus contends that the dog was originally behind a dilapidated fence near the trash dumpster but when Andrus walked away from the dumpster, the dog got out by crawling under the fence and attacked him, biting him and causing him to fall and sustain serious injuries. Andrus' injuries were primarily from the fall and not the alleged bite.
The Defendants disputed Andrus' version of the events. Their witnesses testified that Princess did not get out on the day of the incident and, moreover, had never been out previously nor ever bitten anyone. At most, the Defendants argued that Andrus may have been startled by the dog barking, causing him to fall or he may have simply tripped and fell on his own.
Following a jury trial, the jury returned a verdict in favor of Andrus and against the Defendants, awarding damages in the amount of $30,443.84. However, the jury was charged with an erroneous strict liability charge which, according to communications between the jury and the trial judge, placed on the record by the trial judge, led the jury to believe it should return a verdict in favor of Andrus, even if it found that the dog did not escape from her yard but simply startled him into falling. The trial court entered judgment in accord with the jury verdict. After denying the defense motion for a new trial and Andrus' motion for judgment notwithstanding the verdict, the defense appealed the liability finding and Andrus answered the appeal requesting an increase in damages.
The first issue raised on appeal by the Defendants is that the trial court erred in failing to charge the jury that the Plaintiff had to prove that the dog "posed an unreasonable risk of harm." The jury was charged with the law regarding dog bites under La. C.C. art. 2321 as interpreted by Allen v. State Farm & Cas. Co., 36,377 (La.App. 2nd Cir.9/18/02), 828 So.2d 190. The Allen interpretation did not require a showing that the dog posed an unreasonable risk of harm, but rather included a stricter liability obligation. Following the rendition of judgment in this case, Allen was overruled by the Louisiana Supreme Court in Pepper v. Triplet, 03-0619 (La.1/21/04), 864 So.2d 181. In Pepper the Court concluded:
we find that, to establish a claim in strict liability against a dog owner under La. Civ.Code art. 2321 as amended in 1996, the plaintiff must prove that his person or property was damaged by the owner's dog, that the injuries could have been prevented by the owner, and that the injuries did not result from the injured person's provocation of the dog. We hold that, to establish that the owner could have prevented the injuries under Article 2321, the plaintiff must show the dog presented an unreasonable risk of harm.
Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable and, if the record is otherwise *127 complete, the reviewing court should make its own independent de novo review and assessment of the record. Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 746-47; Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). More specifically, when reviewing courts have found that a lower court utilized an improper burden of proof, the jurisprudence has recognized that such an error may have interdicted the fact-finding process and calls for a de novo review of the evidence. Campo v. Correa, supra; Ferrell v. Fireman's Fund Insurance Co., supra; Duncan v. Safeway Ins. Co. of La., 35,240 (La.App.2nd Cir. 10/31/01), 799 So.2d 1161, 1163; Valley v. Specialty Restaurant Corp., 98-0438 (La.App. 4th Cir.1/19/99), 726 So.2d 1028, 1032;
Andrus concedes that the trial court charge to the jury was erroneous and that this Court must review the evidence relating to liability de novo.
In reviewing the record de novo to determine whether the Defendant's dog posed an unreasonable risk of harm to the Plaintiff, we are again guided by Pepper v. Triplet, supra. In Pepper, the Court noted:
In Boyer v. Seal, 553 So.2d 827, 832 (La.1989), we stated that the criterion for determining whether a defendant has created or maintained an unreasonable risk of harm is a balancing of claims and interest, a weighing of the risk and gravity of harm, and a consideration of individual and societal rights and obligations. We have explained that the judicial process involved in deciding whether a risk is unreasonable is similar to that employed in determining whether a risk is unreasonable in a traditional negligence problem, and in deciding the scope of duty or legal cause under the duty risk analysis. Entrevia v. Hood, 427 So.2d 1146 at 1149 (La.1983). The rationale is that in "both delictual areas the judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community." Id.

In reviewing this case de novo, the evidence in the case reveals the following. The first witness to testify was Auduong, part owner of L.A.D., which owns Princess. Auduong testified that he was not present on the day of the accident, August 13, 2000. His brother, Sam, was present and an employee. He testified that L.A.D. owned Princess for ten years and she stays in the fenced area behind the store for security. He stated that she does bark at people if they get too close to the fence. He testified that his brother did not tell him about the incident, but a delivery man told his wife about a week later and she told him. He stated that he had security cameras around the store but that most of them did not work. The security camera that worked was focused on the cash register only. He stated that he did not have the tape from the camera because it is his custom to reuse it every week if it is not needed or does not contain anything important. He stated that he goes through the tape each night, the tape from the date of the incident did not contain anything relevant to the incident, and it had been reused. He also stated that he did not inspect his fence regularly because he had never had a problem. He had a Beware of Dog sign on the fence because people go between the dumpster and the fence to urinate. There was a board at the bottom of the fence. He stated that it had been there since he bought the store ten years earlier. He didn't know why it was *128 there and the dog had never gotten out of the fenced area. Finally, Auduong testified that the dog often stays in the shaded area right outside of the open back door but never comes into the store and has never bitten anyone.
Next, Lan Dinh, Auduong's wife, testified as the corporate representative. She was not at the store the day of the incident, but stated that she was told of the incident the next day. She testified that Princess had never attacked anyone. She admitted that Princess had been pregnant four times and explained this by stating that she had seen small dogs in the yard with Princess in the morning on occasion when she came to open the store.
Terry McClain, a fence installer, testified. He stated that he was the person who originally installed the fence 20 to 30 years ago. He stated that, when he was hired to put up a new fence to expand the parking area, sometime after the incident in this case, the boards at the bottom of the chain link fence which retained Princess in the rear yard, were nailed to the fence. However, he stated that he did not know how long it had been like that. He frequented the store, but he could not recall how long the boards had been there. He also stated that when he took down the old fence, some of the ties linking the fence to the posts were missing and some were still attached. He stated that the fence was fairly close to the ground.
The next witness to testify was Thao Phan (Phan), the employee at the store on the day of the incident. Phan testified that she had been employed at the store for six years. She was working on August 13, 2000, at the time of the incident. She heard the dog barking and looked out the back and thought she saw Andrus urinating near the dumpster. After going back inside, Phan testified that a customer came into the store and reported the incident. Phan went to the door of the store and saw Andrus getting up off of the ground. Phan asked Andrus if he needed anything and Andrus answered that he did not and he got up and left. She testified that he did not tell her at that time that he had been bitten by a dog. She stated that the dog was inside the fence at this time. Phan also stated that the dog never got out of the fence and never came into the store. She stated that the dog had never bitten anyone in the six years that she worked there. She also stated that the fence was close to the ground.
Sam Auduong (Sam) testified that he was working at the store at the time of this incident. Andrus' counsel called Sam and Sam had told him that he didn't remember anything about the incident, but now he remembered things. Sam stated that he was very busy when Andrus' counsel first called so he couldn't think of anything, but he would try today to remember what he could. He stated that a customer may have come in and reported an accident but he heard something and went outside. He testified that he saw Andrus on the ground and he was breathing heavily. He was worried about Andrus' heart and asked if he wanted the police or emergency personnel. Andrus stated that he did not and got up and started walking off. Sam stated that at that point he went back inside. Sam testified that when he went to the door, the dog was behind the fence. He also stated that in all the years he was there that the dog had never bitten anyone. He testified that the dog sometimes jumped at the fence when people got too near the fence and that scared people. He also stated that when delivery men go into the back yard for deliveries, Princess has never bitten them. He testified also that there was a large trash barrel between the gas pumps. Sam stated that he had a *129 disagreement with his brother, Auduong, and has not spoken to him in two years.
Darren Mack, the humane officer who responded to the complaint, testified. He stated that his report indicated that Andrus was bitten/scratched on the left leg but that he writes down what the complainant says. He testified that he saw marks on Andrus but did not want to say definitively that they were bite marks. He did not feel that that was his field of expertise. He testified that his office is next door to the store and he has gone to the store approximately two times a day for the past ten years. He has never seen Princess not behind the fence. He estimated that the space between the bottom of the fence and the ground was about two to three inches and that Princess' head was approximately three to four inches wide. He noted that the wood was at the bottom of the fence along with some trash. He could not say whether the wood was attached to the fence at the time he went out, three or four days after the incident, and picked up the dog. However, by the time the dog was returned to the store, the wood was attached to the fence. Mack testified that in ten years he had never seen Princess when she was not behind the fence.
Sheldon Andrus III, Andrus' son, testified that his father called home on Sunday evening and reported that he had been bitten by a dog. When he arrived home he needed help getting from his car into the house and he was limping. He never looked at his father's leg to say whether there were bite marks or not. He saw scratches on his knee.
Dr. Richard Roberts, the emergency room physician, testified that Andrus came to the emergency room while he was on duty on August 17, 2000, four days after the incident. He stated that the patient reported that he had been bitten by a dog and had fallen down. Dr. Roberts testified that he saw, and put in his report, what he would describe as a minor dog bite on Andrus' right calf and severe injury and bruising to his left knee and left elbow where he had fallen. Dr. Roberts stated that he was much more concerned with the fall injuries than the dog bite. He recommended that Andrus see an orthopedist immediately. He prescribed anti-inflammatory medication for the knee and elbow and Augmentin for the dog bite.
Finally, Andrus testified stating that he had put gas in his car and wanted to empty some trash from the car. He took a bag of trash over to the dumpster and threw it away. As he was walking away, he heard a dog growling and looked back to see the dog coming out from under the fence, with the dog half way out. He tried to move quickly and the dog clamped on to his left leg and he fell down onto the asphalt, mainly on his knee and elbows. The dog continued to nip at him. He stated that a female customer saw the incident and ran into the store to tell the employees. Sam came out and stood over him asking him what happened and accusing him of urinating by the dumpster. He testified that he saw another Vietnamese boy grab the dog by the collar and bring her in the front of the store. He stated that he told Sam that his dog bit him. He also stated that after getting up he went into the store and paid for the gas and told the lady behind the counter that the dog bit him. He testified that he went back to the store about a week later and took a picture of the fence. Since he was in the insurance business, he knew to take pictures, and the board was at the bottom of the fence, but it was not there a week earlier at the time of the incident. He testified that he did not use the trash barrel by the pump because he emptied the trash from the passenger side of the *130 car, away from the pumps, and saw the dumpster behind him. He admitted that he had been arrested for possession of cocaine in November of 2000, following this incident and had been convicted of a felony. On cross examination Andrus read from his earlier deposition where he stated that he did not know where the dog came from and did not see it until it was by his legs. Andrus admitted that there had been an incident in April of 1999 where he had fallen at Home Depot and hurt his back. A lawsuit had been filed but Andrus claimed that he had not authorized it. He just wanted payment for his medical expenses. The suit also alleged damages of the right meniscus. Andrus further admitted that after the incident in this case, he tripped and fell at Frank's Nursery and filed suit against them. Andrus also stated that he was involved in an automobile accident in May of 2002 where he was rear-ended, totaling his car, and he filed a law suit over that. He stated that the dog first bit him on the lower left leg and above the right knee. However, at the emergency room he only told the doctor about the bite on the right calf because it was most clearly a dog bite. He admitted that in his deposition he stated that he did not see the dog come from under the fence, but he explained at trial how he did see her coming under the fence.
Eileen Andrus, Andrus' wife, testified that her husband came home on the night of August 13, 2000 limping and bloody. She helped him and cleaned the wounds. She noticed what appeared to her to be dog bite marks on his legs.
Andrus had the burden of proving by a preponderance of the evidence that the dog caused damage or injury to his person, which the owner could have prevented and which did not result from the injured person's provocation of the dog. As recently explained in Pepper v. Triplet, 03-0619 (La.1/21/04), 864 So.2d 181, to ascertain whether the owner could have prevented the injury or damage, the plaintiff must establish that the dog posed an unreasonable risk of harm. After reviewing the evidence in this case de novo, we find that Andrus simply did not meet his burden of proof that, under the facts as presented, the dog posed an unreasonable risk of harm.
The overwhelming evidence by the Defendant's employees and objective disinterested witnesses was that the dog had never been seen outside of her fenced in space, that she had never bitten anyone and she did not act aggressively. The humane officer, who visited the store twice a day for ten years, had an opportunity to objectively observe the dog and testified that he had never seen the dog outside of the fence, or in the store. He described how the dog was often outside of the rear door to the store without entering the store or acting in an aggressive manner. The only contrary testimony came from Andrus, who had an interest in his testimony. The evidence does prove by a preponderance that Andrus fell outside of the Defendant's store and seriously injured himself in that fall. However, the evidence simply does not support a finding that these injuries were caused directly by the Defendant's dog, that is, that the dog escaped from under the fence and bit Andrus, or that the dog, who had never bitten anyone or ever been outside of her fenced in yard where she secured the rear of the store, posed an unreasonable risk of harm by barking inside the fence.
Under Pepper, supra, the Court should, after making a strict liability analysis, go on to consider a negligence cause of action. In this case, there is some evidence that Andrus waived the assertion of his negligence action. Nevertheless, in view of our finding that the evidence does *131 not preponderate in favor of a finding that the dog escaped from under the fence and bit him, that the fence was in disrepair, or that the Defendant knew or should have known that it was possible for the dog to escape, it does not support a negligence cause of action against the Defendants.
Based on the foregoing, because the lower court erred in not properly charging the jury, we have reviewed the evidence de novo and found that the Plaintiff did not prove, by a preponderance of the evidence, his entitlement to damages under either strict liability or negligence pursuant to La. C.C. art. 2321 and, accordingly, we reverse the judgment in favor of Andrus, grant judgment in favor of the Defendants and order Andrus' case dismissed will prejudice. Costs of appeal are to be paid by Andrus.
REVERSED AND RENDERED.
NOTES
[1] De Auduong, the part owner of L.A.D., was originally sued as a Defendant, but was, on March 27, 2003, dismissed from the case.